# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| GLEAN TECH FUND II LP, and GLEAN TECH II LLC - SERIES A-CL,<br><br>Plaintiffs,<br><br>v.<br><br>GREG MCINTOSH, KIMMY SCOTTI, RAHUL GANDHI, IRON MOUNTAIN INFORMATION MANAGEMENT LLC, IRON MOUNTAIN INC., EASTWARD FUND MANAGEMENT LLC, JAVIER VILLAMIZAR, and CARTER ADAMSON,<br><br>Defendants,<br><br>and<br><br>CLUTTER HOLDINGS, INC.,<br><br>Nominal Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    C.A. No. 2024-0032-PAF |

## MEMORANDUM OPINION

Date Submitted:  April 15, 2025
Date Decided:  September 2, 2025

David J. Margules, Elizabeth A. Sloan, Alan C. Cardenas-Moreno, BALLARD SPAHR LLP, Wilmington, Delaware; Velvel Freedman, FREEDMAN NORMAND FRIEDLAND LLP, Miami, Florida; Stephen Lagos, FREEDMAN NORMAND FRIEDLAND LLP, New York, New York; Terence M. Grugan, BALLARD SPAHR LLP, Philadelphia, Pennsylvania; *Attorneys for Plaintiffs Glean Tech Fund II LP and Glean Tech II LLC - Series A-CL.*

John M. Seaman, Eliezer Y. Feinstein, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Stephen E. Hudson, Jeffrey H. Fisher, KILPATRICK TOWNSEND & STOCKTON LLP, Atlanta, Georgia; Joseph B. Gadberry, KILPATRICK

TOWNSEND & STOCKTON LLP, Raleigh, North Carolina; *Attorneys for Defendants Greg McIntosh, Iron Mountain Information Management LLC, and Iron Mountain, Inc.*

Timothy S. Martin, Daryll Hawthorne-Bernardo, WHITE & WILLIAMS LLP, Wilmington, Delaware; Patrick M. Kennell, Matthew H. Lee, KAUFMAN DOLOWICH, LLP, New York, New York; *Attorneys for Defendants Kimmy Scotti, Rahul Gandhi, Javier Villamizar, Carter Adamson, and Nominal Defendant Clutter Holdings, Inc.*

Douglas D. Herrmann, Emily L. Wheatley, TROUTMAN PEPPER LOCKE LLP, Wilmington, Delaware; *Attorneys for Defendant Eastward Fund Management LLC*.

**FIORAVANTI, Vice Chancellor**

A corporation defaulted on its senior credit facility, and the senior secured creditor declared a default and demanded accelerated payment under the terms of the facility. The senior secured creditor foreclosed on all of the debtor's operating assets and sold them at a public auction. The debtor's junior creditor, which was also a 27% stockholder of the debtor, bought the assets for a fraction of their alleged value. Shortly thereafter, the buyer sold a total of 15% of the equity in the acquired business to various, former "stakeholders" of the debtor. The debtor has since dissolved.

Two minority stockholders of the debtor, who were not offered the chance to participate in the post-foreclosure equity sale, claim that the foreclosure sale was a sale of all assets of the debtor, requiring stockholder approval under 8 *Del. C.* § 271. Because stockholders did not approve the sale, the complaining stockholders contend the foreclosure was invalid. These stockholders also allege that the company's board of directors breached its duties by failing to prevent the foreclosure sale and that the buyer, as a controlling stockholder of the debtor, breached its fiduciary duties to the plaintiffs. The complaining stockholders also allege that the senior secured creditor aided and abetted the board and controller's breaches of fiduciary duty.

The defendants have moved to dismiss, arguing that the foreclosure sale did not trigger a stockholder vote under the Delaware General Corporation Law and that

3

the fiduciary duty and aiding and abetting claims are derivative and must be dismissed under Court of Chancery Rule 23.1 for failure to plead demand futility. Alternatively, the defendants have moved to dismiss all claims for failure to state a claim under Rule 12(b)(6).

With the exception of the statutory claim, the court concludes the plaintiffs' claims are derivative, and the plaintiffs neither made a pre-suit demand nor pleaded with particularity that making a pre-suit demand would have been futile. In addition, the court concludes the plaintiffs have failed to state a statutory claim under Section 271. Accordingly, the complaint must be dismissed in its entirety.

## I.  BACKGROUND

The facts are drawn from the allegations of the verified amended complaint (the "Amended Complaint"), and the documents integral thereto.[1]

### A.  Parties

Clutter Holdings, Inc. ("Clutter" or the "Company") was formed in 2015 as a Delaware corporation and was focused on leveraging advancements in technology in the moving and storage business.[2]

---

[1] Citations to the docket in this action are in the form of "Dkt. [#]." In citations, the Amended Complaint in this action, Dkt. 41, will be cited as "Am. Compl." Citations to the transcript from oral argument, Dkt. 72, will be cited as "Oral Arg." After being identified initially, individuals are referenced herein by their surnames without regard to honorifics. No disrespect is intended.

[2] Am. Compl. ¶¶ 14, 19.

Plaintiffs Glean Tech Fund II LLP and Glean Tech II LLC - Series A-CL (collectively, "Glean Tech") were among the Company's equity investors, holding both common and preferred stock of Clutter at all relevant times.[3]

Iron Mountain Inc. and Iron Mountain Information Management LLC (collectively, "Iron Mountain") were, collectively, Clutter's largest stockholder, owning approximately 27% of the Company's equity.[4] Iron Mountain was also one of the Company's junior creditors.[5] Iron Mountain had the right to designate one director to the Company's board of directors (the "Board").[6] At all relevant times, Iron Mountain's designee was Greg McIntosh.[7] McIntosh is a senior executive at Iron Mountain.[8]

Eastward Fund Management LLC ("Eastward") was the Company's senior secured creditor.[9] Eastward's $20 million loan to Clutter was secured by all of Clutter's assets.[10]

---

[3] *Id.* at ¶ 6.

[4] *Id.* at ¶ 7.

[5] *Id.* at ¶¶ 2, 7, 84.

[6] *Id.* at ¶ 7.

[7] *Id.* at ¶ 8.

[8] *Id.*

[9] *Id.* at ¶ 12.

[10] *Id.* at ¶ 35.

At all relevant times, the Board comprised Carter Adamson, Rahul Gandhi, McIntosh, Kimmy Scotti, and Javier Villamizar (together, the "Director Defendants").[11]

## B. The MakeSpace Merger

In February 2022, Clutter merged with its largest competitor, MakeSpace, LLC ("MakeSpace").[12] At the time of the merger, MakeSpace's lead investor was Iron Mountain, which owned 49.99% of its equity before the merger.[13] After the merger, Iron Mountain owned 27% of the equity in the merged company, which retained the Clutter name.[14] Iron Mountain also had a contractual relationship with MakeSpace and, by virtue of the merger, the post-merger Clutter. According to the Amended Complaint, approximately 80% of Clutter's commercial storage facilities leases were with Iron Mountain.[15] The lease agreements are not in the record, and their terms are not described in the Amended Complaint.

The post-merger board was a combination of directors from each of the two merged companies.[16] From the MakeSpace side of the transaction, Gandhi,

---

[11] *Id.* at ¶¶ 8–11.

[12] *Id*. at ¶¶ 20, 24.

[13] *Id*. at ¶¶ 7, 20.

[14] *Id*. at ¶ 26.

[15] *Id*. at ¶ 25.

[16] *Id*. at ¶ 26.

McIntosh, and Scotti remained on the board of the merged entity. Gandhi was MakeSpace's founder and Chief Executive Officer ("CEO").[17] McIntosh was Iron Mountain's board designee.[18] Scotti was the designee of 8VC Funding I, LP ("8VC"), a New York based investment firm that she had co-founded.[19]

Of Clutter's pre-merger board, three members continued on as directors of the post-merger Clutter.[20] Ari Mir, Clutter's co-founder and CEO, held the positions of CEO and director in the post-merger Clutter until he resigned in late 2022.[21] His vacant board seat was not filled.[22] Villamizar was a board designee of Clutter investor Softbank Vision Fund (AIV M2) LP ("Softbank").[23] Adamson served as the designee of Clutter investor Atomico IV, LP ("Atomico").[24]

Around the time of the merger, Gandhi predicted Clutter would experience $200 million of annual revenue in the next full year following the merger and further

---

[17] *Id.* at ¶¶ 9, 26.

[18] *Id.* at ¶¶ 8, 26.

[19] *Id.* at ¶¶ 10, 26.

[20] *Id.* at ¶ 26.

[21] *Id.*

[22] *Id.*

[23] *Id.* at ¶ 11.

[24] *Id.* Softbank is not a party to these proceedings. Atomico was originally named as a defendant, but Plaintiffs voluntarily dismissed the claims against Atomico after filing the Amended Complaint. Dkt. 48.

predicted an initial public offering to take place in 2023.[25]  Post-merger, Clutter saw

annual revenue growth.  In 2022, Clutter "was profitable and EBITDA-positive" and

"realized over $100 million in revenue."[26]

### C. Eastward Sends a Default Notice and Forecloses on the Company's Assets; Iron Mountain Purchases the Assets at Auction.

In early 2023, Clutter experienced short-term liquidity issues and defaulted on

its $20 million loan with Eastward.[27]  Clutter also failed to make payments to Iron

Mountain, which gave Iron Mountain the "right to terminate its critical partnership

with Clutter."[28]  On June 14, 2023, Eastward sent Clutter a notice of default and

demanded immediate payment of its $20 million loan.[29]  One week after Eastward

declared default, Eastward "announced it would foreclose on the debt" within ten

days.[30]  The Board considered proposals to pursue a voluntary bankruptcy and to

seek a temporary restraining order, but decided not to pursue either proposal.[31]

Gandhi later told Plaintiffs that "the Board did not retain an investment bank or other

---

[25] Am. Compl. ¶ 30.

[26] *Id.*

[27] *Id.* at ¶ 34.

[28] *Id.* Plaintiffs do not provide particularized facts regarding a formal partnership relationship between Iron Mountain and Clutter.

[29] Am. Compl. ¶¶ 34–36; Dkt. 54 ("Director Defs.' Opening Br.") Ex. 1.

[30] Am. Compl. ¶¶ 35, 48.

[31] *Id.* at ¶ 50.

competent financial advisor to assist it in identifying alternatives" to Eastward's foreclosure.[32]

Eastward proceeded to foreclose on all of Clutter's operating assets and sell them at a public auction.[33] Eastward advertised the auction in the *Los Angeles Times* and the *New York Times*.[34] The auction was held on June 27, 2023, at the New York offices of Eastward's counsel, Troutman Pepper Hamilton Sanders LLP.[35] Iron Mountain was the only bidder and "acquired all of the Clutter assets for $15 million, plus the assumption of $15 million in Clutter debt."[36] Plaintiffs allege Eastward and Iron Mountain had reached an agreement prior to the auction that Iron Mountain would purchase the assets, and the Board "was well aware of Iron Mountain and Eastward's plan before it was executed."[37]

At the auction, Iron Mountain purchased 100% of the outstanding shares of Clutter Intermediate Inc., a Clutter subsidiary which held all of Clutter's assets and

---

[32] *Id.* at ¶ 49.

[33] *Id.* at ¶ 36.

[34] *Id.* at ¶ 51 & n.2. Plaintiffs have raised concerns about the type and form of advertisements made by Eastward. *See* Dkt. 60 ("Pls.' Answering Br.") 36–37 & n.12. Plaintiffs have not asserted claims under the Delaware Uniform Commercial Code challenging the commercial reasonableness of the sale. Oral Arg. at 50:1–13.

[35] Am. Compl. ¶ 36; Dkt. 55 ("Eastward's Opening Br.") Ex. A.

[36] Am. Compl. ¶¶ 36–37, 52.

[37] *Id.* at ¶¶ 38, 52.

operations.[38] The proceeds from the sale did not satisfy the full amount of debt owed to Eastward, and Clutter's "common and preferred equity holders were 'wiped out.'"[39] Plaintiffs allege they were unaware of these transactions until mid-July 2023, when Gandhi informed their representatives of what had occurred.[40]

### D. Iron Mountain Sells a Portion of its Clutter Equity.

In October 2023, Iron Mountain sold 15% of its Clutter equity interests to unidentified former Clutter "stakeholders."[41] Plaintiffs were not offered the opportunity to participate in Iron Mountain's equity sale.[42] The Amended Complaint does not allege which "stakeholders" were afforded the opportunity to participate in the offering. Rather, it alleges, inferentially, that Iron Mountain only offered Eastward, the Director Defendants, and their affiliated entities an opportunity to participate in the equity sale. As support for this allegation, Plaintiffs point to the Eastward and Atomico websites, post-foreclosure, which carry over the pre-foreclosure references to their investments in Clutter.[43]

---

[38] *Id.* at ¶ 37.

[39] *Id.*

[40] *Id.* at ¶¶ 32–34.

[41] *Id.* at ¶ 57.

[42] *Id.* at ¶ 59.

[43] *Id.* at ¶ 59; *id.* at ¶ 61 ("Eastward apparently made such an investment, as evidenced by Eastward's website, which indicates that it is currently an investor in Clutter.").

On December 29, 2023, Clutter informed its stockholders that Clutter "was dissolved effective December 22, 2023."[44] In February 2024, Iron Mountain filed its annual report on Form 10-K with the U.S. Securities and Exchange Commission. Iron Mountain disclosed:

> On June 29, 2023, . . . we acquired 100% of the outstanding shares of Clutter Intermediate, Inc. and control of all assets of the Clutter JV (collectively, "Clutter") for total consideration of $60.6 million (the "Clutter Acquisition"). The financial results of the Clutter JV are now consolidated within our Global RIM Business segment. In October 2023, we sold 15% of the equity interests in Clutter to certain former stakeholders of the Clutter JV for total consideration of $7.5 million, which represents the fair value attributable to these interests . . . .[45]

Plaintiffs allege that "it is reasonably and readily inferable from the disclosure that Eastward and the Director Defendants (or their affiliated entities, *i.e.*, 8VC, Atomico, and SoftBank) were recipients of the co-investment opportunity," and "Iron Mountain made clear to both Eastward and to the Board that, in exchange for their agreement and acquiescence to the [challenged transaction], Iron Mountain would subsequently give them the opportunity to invest in a less-indebted Clutter at a discounted price."[46]

---

[44] *Id.* at ¶ 40.

[45] *Id.* at ¶ 57 (alteration in original).

[46] *Id.* at ¶¶ 59–60.

11

### E. Procedural History

Plaintiffs filed their initial complaint on January 12, 2024, against Eastward, Iron Mountain, Gandhi, McIntosh, and Scotti.[47] Plaintiffs filed the Amended Complaint on June 6, 2024, adding Atomico, Adamson, and Villamizar as defendants.[48] The Amended Complaint asserts three counts. Count I asserts a statutory claim under Section 271 of the Delaware General Corporation Law ("DGCL").[49] Count II asserts a claim for breach of fiduciary duty against Iron Mountain, as an alleged controlling stockholder, and the Director Defendants.[50] Count III asserts a claim for aiding and abetting against Atomico, Eastward, and, alternatively, against Iron Mountain.[51]

The defendants each filed a motion to dismiss the Amended Complaint.[52] Thereafter, Plaintiffs voluntarily dismissed their aiding and abetting claim against

---

[47] Dkt. 1. There is no indication that Plaintiffs availed themselves of their right to inspect Clutter's books and records under 8 *Del. C.* § 220 to craft their Complaint. *See Mizel v. Connelly*, 1999 WL 550369, at *5 n.5 (Del. Ch. July 22, 1999) (noting that derivative plaintiffs who "fail to use those tools [at hand] to craft their pleadings do so at some peril").

[48] Dkt. 41.

[49] Am. Compl. ¶¶ 77–81.

[50] *Id.* at ¶¶ 82–88.

[51] *Id.* at ¶¶ 89–96. The Amended Complaint also asserts a claim for aiding and abetting against the Director Defendants, but Plaintiffs' counsel indicated this was an error at oral argument on the pending motions. Oral Arg. at 53:3–13.

[52] Dkts. 44, 47, 49–50.

Atomico.[53]  The remaining claims are asserted against the Director Defendants, Eastward, Iron Mountain, and Clutter as nominal defendant (together, the "Defendants").  Following briefing, the court held oral argument on the pending motions on April 21, 2025.[54]

## II.  ANALYSIS

Defendants have moved to dismiss the Amended Complaint under Rule 23.1 for failure to plead demand futility and under Rule 12(b)(6) for failure to state a claim.  On a motion to dismiss for failure to state a claim under Rule 12(b)(6):

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citation modified); *see also Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).  The plaintiff is "entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences." *White v. Panic*, 783 A.2d 543, 549 (Del. 2001) (citation modified).  "[A] claim may be dismissed if

---

[53] Dkt. 48.  In their briefing, Plaintiffs indicated they received an affidavit from Atomico averring that it did not purchase any equity interests from Iron Mountain in October 2023.  Dkt. 60 ("Pls.' Answering Br.") at 11 n.3.

[54] Dkts. 53–55, 60, 66–68, 71.

13

allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law." *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001). The court need not "accept every strained interpretation of the allegations proposed by the plaintiff." *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede*, 780 A.2d at 1083).

## A. Did Iron Mountain Control Clutter?

Plaintiffs allege that Iron Mountain was Clutter's controlling stockholder and, therefore, owed fiduciary duties to the Plaintiffs. Plaintiffs allege that Iron Mountain's control derived from its ownership of 27% of Clutter's voting stock and contractual arrangements with the Company. Defendants argue that Iron Mountain was not a controller and did not owe fiduciary duties to Plaintiffs or the Company.

"As a general rule, stockholders do not owe fiduciary duties to the corporation or its stockholders and are free to act in their self-interest." *In re Oracle Corp. Deriv. Litig.*, 339 A.3d 1, 19 (Del. 2025). An exception to the general rule exists when the stockholder is deemed to be a controller. "A stockholder could be found a controller under Delaware law: where the stockholder (1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but exercises control over the business affairs of the corporation." *Sheldon v. Pinto Tech. Ventures, L.P.*, 220 A.3d 245, 251 (Del. 2019) (citation modified).

When the assertion of control is not based upon ownership of more than 50% of the voting power of the corporation, as is the case here, a plaintiff must plead facts to support a reasonable inference that the alleged controller possessed "(i) control over the corporation's business and affairs in general or (ii) control over the corporation specifically for purposes of the challenged transaction." *Voigt v. Metcalf*, 2020 WL 614999, at *11 (Del. Ch. Feb. 10, 2020). In other words, "the plaintiff may plead either (or both) of the following: (1) that the minority blockholder actually dominated and controlled the corporation, its board or the deciding committee with respect to the challenged transaction or (2) that the minority blockholder actually dominated and controlled the majority of the board generally." *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *13 (Del. Ch. March 28, 2018). "[T]he *potential ability* to exercise control is not sufficient." *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *26 (Del. Ch. July 6, 2018) (citation modified), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019) (TABLE). "A plaintiff must allege domination by a minority shareholder through actual control of corporation conduct." *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1114 (Del. 1994) (citation modified).

"The test for actual control by a minority stockholder is not an easy one to satisfy." *Oracle*, 339 A.3d at 20 (citation modified); *see Sciabacucchi v. Liberty*

15

*Broadband Corp.*, 2017 WL 2352152, at \*16 (Del. Ch. May 31, 2017) ("The requirements for a sufficient pleading of controller status are appropriately rigorous . . . ."). The defendant's "power must be so potent that independent directors cannot freely exercise their judgment, fearing retribution from the controlling minority blockholder." *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013) (citation modified).

"To plead that the requisite degree of control exists generally, a plaintiff may allege facts supporting a reasonable inference that a defendant or group of defendants exercised sufficient influence 'that they, as a practical matter, are no differently situated than if they had majority voting control.'" *Voigt*, 2020 WL 614999, at \*11 (quoting *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at \*9 (Del. Ch. Aug. 18, 2006)). To make such a showing, the plaintiff may "plead that the defendant, as a practical matter, possesses a combination of stock voting power and managerial authority that enables him to control the corporation, if he so wishes." *Voigt*, 2020 WL 614999, at \*11 (citation modified).

"Examples [of actual control,] include, but are not limited to, (i) relationships with particular directors, (ii) relationships with key managers or advisors, (iii) the exercise of contractual rights to channel the corporation into a particular outcome, and (iv) the existence of commercial relationships that provide the defendant with leverage over the corporation, such as status as a key customer or supplier." *Id.* at

16

*12. Broader indicia of effective control may also factor into the court's control analysis, including the "ownership of a significant equity stake (albeit less than a majority), the right to designate directors (albeit less than a majority), decisional rules in governing documents that enhance the power of a minority stockholder or board-level position, and the ability to exercise outsized influence in the board room or on committees, such as through high-status roles like CEO, Chairman, or founder." *Id.*

To establish transaction-specific control, an allegation of "pervasive control over the corporation's actions is not required." *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006). Rather, a plaintiff "must plead facts supporting a reasonable inference that the defendant in fact exercised actual control with regard to the particular transaction that is being challenged." *Voigt*, 2020 WL 614999, at *12 (citation modified). Supporting facts could include, for example, that "the defendant engaged in pressure tactics that went beyond ordinary advocacy to encompass aggressive, threatening, disruptive, or punitive behavior." *Id.* at *13.

At the pleadings stage, a reasonable inference of actual control rests on the totality of the facts and circumstances considered in the aggregate. *See In re Vaxart, Inc. S'holder Litig.*, 2021 WL 5858696, at *15 (Del. Ch. Nov. 30, 2021) ("Because the controller analysis is fact-intensive, the court is unlikely to find control unless

plaintiffs can plead a constellation of facts supporting control." (citation modified)). The inquiry is fact specific. *Oracle*, 339 A.3d at 21; *Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 506–07 (Del. 2005).

### 1. Iron Mountain did not exercise general or transaction-specific control over Clutter.

In support of Plaintiffs' position that Iron Mountain exercised control over Clutter, Plaintiffs point to a combination of the following facts: (1) Iron Mountain's equity stake in the Company; (2) Iron Mountain's appointment of one director on Clutter's Board; (3) a tie-breaking provision in the Clutter Certificate of Incorporation (the "Certificate"); and (4) Iron Mountain's contracts with Clutter.

### a. Equity stake

Possession of a large voting block can contribute to an inference of control. *See Tornetta v. Musk*, 310 A.3d 430, 502–03 (Del. Ch. 2024) (observing that equity positions of 25% or less have contributed to both pleading-stage inferences and post-trial findings that a minority stockholder owed fiduciary duties as a controller); *id.* at 498 n.556 (collecting cases) (*appeal docketed*, Case No. 534, 2024C (Del. Dec. 30, 2024). There are also instances where stockholders owning in excess of 25% of the outstanding voting power were not controllers. *See, e.g., Sciannella v. AstraZeneca UK Ltd.*, 2024 WL 3327765, at *17 n.180 (Del. Ch. July 8, 2024) (collecting cases), *aff'd*, ___ A.3d. ___ (Del. 2025), 2025 WL 946148 (Del. Mar. 26, 2025) (TABLE).

Beyond citing to Iron Mountain's 27% equity stake in Clutter, the Amended Complaint contains no well-pleaded allegations that Iron Mountain possessed the power to control Clutter generally or specifically in responding to the foreclosure. There are no allegations that Iron Mountain possessed any power to veto any transaction or to control the composition of the Board. *Cf. In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at *21 (Del. Ch. Sept. 19, 2008) (finding control post-trial where minority stockholder had, among other things, "substantial blocking power" over corporate governance changes and major corporate transactions); *Tesla Motors*, 2018 WL 1560293, at *15 (noting CEO's supermajority voting rights over bylaw amendments as among factors leading to a pleadings-stage inference of control); *Williamson v. Cox Comm'ns, Inc.*, 2006 WL 1586375, at *5 (Del. Ch. June 5, 2006) (drawing pleadings-stage inference of control where minority stockholder had "the ability to shut down the effective operation of the [company's] board of directors by vetoing board actions"); *Tornetta*, 310 A.3d at 503 (finding control post-trial where CEO's equity block gave him "a sizable leg-up for stockholder votes generally[,] the ability to block specific categories of bylaw amendments[, and] great influence in the boardroom"). There are also no allegations that Iron Mountain selected or had the power to select Clutter's management team.

Plaintiffs allege that 80% of Clutter's commercial leases were through contracts with Iron Mountain. The terms of those contracts are not alleged. There

19

are no allegations that the contracts gave Iron Mountain any governance rights over Clutter. There are no allegations to suggest that these contracts were the product of anything other than arm's length negotiations. Nor are there any well-pleaded allegations that Iron Mountain threatened to terminate or force renegotiation of any of these contracts at any time. *Cf. Basho*, 2018 WL 3326693, at \*29–32 (controller exercised contractual rights to block the company's financing, withheld funds, and threatened to fire management if they did not comply with his demands). The mere existence of these contracts, without more, does not support a reasonable inference that Iron Mountain exerted control over Clutter or its Board. *See Sciannella*, 2024 WL 3327765, at \*22 (concluding that contractual arrangements between 26% stockholder and the company were insufficient to infer the stockholder had the ability to dominate the board or exercise control over the corporation). Furthermore, there are no well-pleaded allegations that Iron Mountain threatened to terminate the agreements.

The Amended Complaint lacks well-pleaded allegations that Iron Mountain controlled a majority of the Board. Iron Mountain had the right to designate one member of the Clutter board. The rights of Iron Mountain's designee did not exceed those of any other director. To the contrary, the Clutter Certificate provided that, in the event of an evenly divided six-member board, the 8VC designee would effectively cast the tie-breaking vote by increasing the power of 8VC's vote and

20

reducing the voting power of the Iron Mountain designee. Plaintiffs do not attempt to explain how this arrangement gives Iron Mountain control over Clutter's Board, particularly considering that at all relevant times, there were only five directors on the Clutter Board, so the tie-breaking provision was not in play.

The Amended Complaint contains no well-pleaded allegations that Iron Mountain controlled a majority of the Board. Even accepting for purposes of this motion that McIntosh and Gandhi are not independent of Iron Mountain, the Amended Complaint does not support a reasonable inference of control over Adamson, Villamizar, or Scotti. Plaintiffs do not attempt to offer any well-pleaded facts to suggest that Iron Mountain controlled Adamson or Villamizar. Instead, they focus on Scotti. But the allegations as to her do not support a reasonable inference of Iron Mountain's control over her.

Plaintiffs allege generally that 8VC "has a long history of co-investing with Iron Mountain."[55] But there are no well-pleaded allegations about this investment history—none. This bare allegation is not enough to support an inference that Iron Mountain controlled Scotti. *See Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 649 (Del. 2014) ("Bare allegations that directors are friendly with, travel in the same social circles as, or have past business relationships with the proponent of a

---

[55] Am. Compl. ¶ 68.

transaction . . . are not enough to rebut the presumption of independence"), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018); *see, e.g.*, *Sciannella*, 2024 WL 3327765, at \*20 (rejecting a conclusory allegation that two directors were susceptible to alleged controller's pressure based on prior investments by funds with which they were affiliated).

Having considered holistically all of the allegations of control, the court concludes that the Amended Complaint lacks well-pleaded allegations to support an inference that Iron Mountain exercised general control over Clutter or specific control in connection with Eastward's foreclosure sale. Therefore, Iron Mountain owed no fiduciary duties to Plaintiffs or the Company and, as a result, Count II must be dismissed as to Iron Mountain for failure to state a claim under Court of Chancery Rule 12(b)(6).

## B. The Plaintiffs' Claims Are Derivative.

Count II alleges the Director Defendants and Iron Mountain breached their fiduciary duties to Plaintiffs. Count III alleges that Eastward and Iron Mountain aided and abetted the Director Defendants' breaches of fiduciary duty. The Defendants have moved to dismiss both counts under Rule 23.1 for failure to plead demand futility and under Rule 12(b)(6) for failure to state a claim. Plaintiffs

contend that demand is not required because the claims are direct, and even if the claims are derivative, demand is futile.[56]

In determining whether claims are direct or derivative, the court must "'look beyond the labels used to describe the claim, evaluating instead the nature of the wrong alleged.'" *Vejseli v. Duffy*, 2025 WL 1189867, at *5 (Del. Ch. Apr. 24, 2025) (quoting *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *7 (Del. Ch. July 26, 2018)). To do so, the court applies the test in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004). Under *Tooley*, the question of whether a claim is direct or derivative "turn[s] *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Id.* at 1033.

"To plead a direct claim under *Tooley*, a 'stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.'" *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1266 (Del. 2021) (quoting *Tooley*, 845 A.2d at 1039).

### 1. Count I is a direct claim.

Count I alleges that the foreclosure sale constituted a sale of all or substantially all of Clutter's assets, thus requiring board and stockholder approval

---

[56] Pls.' Answering Br. 38–45.

under Section 271 of the DGCL. If Section 271 applies to the foreclosure sale, then it is indicative of a direct claim. The claim alleges harm to the Plaintiffs' statutory voting rights. *See In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1050 (Del. Ch. 2015) ("Stockholders . . . can sue directly to enforce contractual constraints on a board's authority under . . . provisions of the DGCL."); *Samuels v. CCUR Hldgs., Inc.*, 2022 WL 1744438, at *9 (Del. Ch. May 31, 2022) (observing that stockholder claim for violation of DGCL Section 155 was a direct claim); *Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, at *5 (Del. Ch. Aug. 16, 2010) (applying *Tooley* and concluding that a claim asserting a violation of DGCL Section 141 was direct). It is the Plaintiffs as stockholders, not the Company, who suffer the alleged harm. *See Vejseli*, 2025 WL 1189867, at *6 ("Delaware courts consistently regard a wrongful impairment by fiduciaries of the stockholders' voting power or freedom as causing a personal injury to the stockholders, not the corporate entity." (citation modified)). Any recovery would run to the Plaintiffs, who have the statutory voting right, not to Clutter. Accordingly, Count I is direct, and the Defendants do not make any serious attempt to argue otherwise.

### 2. Counts II and III are derivative claims.

Under *Tooley*, Counts II and III are derivative claims. "A claim is considered 'derivative in nature,' under the first element of the *Tooley* test, '[w]here all of a corporation's stockholders are harmed and would recover *pro rata* in proportion

24

with their ownership of the corporation's stock solely because they are stockholders.'" *Bocock v. Innovate Corp.*, 2022 WL 15800273, at \*16 (Del. Ch. Oct. 28, 2022) (alteration in original) (quoting *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008)).  Plaintiffs allege that Iron Mountain, with Eastward's assistance, acquired the Company's assets at the foreclosure sale for a steep discount, and the Director Defendants failed to prevent the foreclosure sale.[57]  As a result, Plaintiffs allege the Company was left as a "worthless shell" with no assets and no equity value.[58]  This is a classic derivative claim under *Tooley*.

Plaintiffs' injury from the foreclosure sale is not independent of any harm suffered by Clutter.  The harm is derivative.  *See Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1188 n.10 (Del. 1988) ("Generally speaking, a wrong to the incorporated group as a whole that depletes or destroys corporate assets and reduces the value of the corporation's stock gives rise to a derivative [claim]."); *see*, *e.g.*, *GB-SP Hldgs., LLC v. Walker*, 2024 WL 4799490, at \*27–28 (Del. Ch. Nov. 14, 2024) (adjudicating breach of fiduciary duty claims challenging board action in response to insolvency as derivative claims).  Plaintiffs would not be able to prevail on their claims without showing an injury to the Company.  *See Brookfield*, 261 A.3d at 1266 ("We do not think Plaintiffs can prevail without showing an injury to the

---

[57] Am. Compl. ¶¶ 50, 52.

[58] *Id.* at ¶¶ 2, 42, 87.

corporation."). The benefit of any recovery would run to the stockholders of the Company on a *pro rata* basis, not to the Plaintiffs individually.[59]  Accordingly, Counts II and III are derivative.

Plaintiffs' attempt to shoehorn this case into the category of direct claims lacks merit.  Plaintiffs rely on *Parnes v. Bailey Entertainment Corp.*, 722 A.2d 1243 (Del. 1999), for the proposition that a complaint "challenging the fairness or validity of a merger" states a direct claim.[60]  In *Parnes*, the Delaware Supreme Court observed that stockholder actions attacking the fairness or validity of a merger can be maintained directly.  722 A.2d at 1245.  There, the CEO of a target company is alleged to have demanded that "any potential acquiror pay [him] for his approval of the merger," despite having no authority to demand such payments, and received "substantial sums of money" and "valuable [target company] assets" during the negotiations of the merger.  *Id.* at 1246–47.  The Supreme Court allowed the plaintiff, a former stockholder of the target, to pursue a direct claim, reasoning that "[a] stockholder who directly attacks the fairness or validity of a merger alleges an

---

[59] Plaintiffs acknowledged at oral argument on the pending motions that it would be difficult to rescind the challenged transaction at this stage and, alternatively, asked the court to award rescissory damages.  Oral Arg. at 54:18–55:3.  Any award of rescissory damages would, similarly, flow to the Company and not the Plaintiffs individually.

[60] Pls.' Answering Br. 38 (citing *Parnes* and collecting cases); *id.* at 43.

injury to the stockholders, not the corporation, and may pursue such a claim even after the merger at issue has been consummated." *Id.* at 1245.[61]

Plaintiffs' reliance on *Parnes* is misplaced. Unlike in *Parnes*, the foreclosure sale, and the Board's alleged inaction to prevent such foreclosure sale, is not a merger. Plaintiffs are not "target" stockholders. Plaintiffs argue this distinction is "immaterial."[62] The court disagrees. "Delaware Courts have interpreted the *Parnes* exception very narrowly." *In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *10 (Del. Ch. Sept. 30, 2009); *accord Siegel v. Cantor Fitzgerald, L.P.*, 2025 WL 1074604, at *10 (Del. Ch. Apr. 10, 2025). The court declines Plaintiffs' invitation to extend it here. *See Siegel*, 2025 WL 1074604, at *10 (rejecting argument that claims were direct under *Parnes* where "[t]here was no sale of the company, change of control, or diversion of consideration from the minority").[63]

---

[61] The *Brookfield* Court confirmed that "[s]tockholders may sue on their own behalf (and, in appropriate circumstances, as representatives of a class of stockholders) to seek relief for direct injuries that are independent of any injury to the corporation." 261 A.3d at 1272 (alteration in the original); *see id.* at 1276–77.

[62] Pls. Answering Br. 39.

[63] The other cases cited by Plaintiffs in their briefing on this issue are distinguishable for the same reasons. *See Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 973–74 (Del. Ch. 2000) (concluding claim was direct under *Parnes* where stockholder plaintiff challenged fairness of merger); *Kelly v. Blum*, 2010 WL 629850, at *13 (Del. Ch. Feb. 24, 2010) (same); *Rabkin v. Philip A. Hunt Chem. Corp.*, 547 A.2d 963, 969 (Del. Ch. 1986) (same).

Another flaw in Plaintiffs' theory of direct harm is that it is predicated on the discarded concept of a "special injury." Plaintiffs argue they suffered an injury from the challenged transaction—*i.e.*, the complete destruction of their equity—not shared by Iron Mountain, the Company's alleged controller who "now own[s] the Clutter assets."[64] In *Tooley*, the Supreme Court expressly rejected the concept of a "special injury." 845 A.2d at 1035 ("We now disapprove the use of the concept of 'special injury' as a tool in th[e] [direct versus derivative] analysis."). The Court recently reaffirmed that holding in *Brookfield*. 261 A.3d at 1264 (observing that *Tooley* "unequivocally abandoned the 'special injury' concept"); *id.* at 1272 ("[T]his Court in *Tooley* sought to bring clarity to this confusing area of the law by discarding the 'special injury' test and announcing a simple test that would be easier to apply."). The primary authorities discussed by Plaintiffs in their briefing all pre-date *Tooley* and rely on the "special injury" concept.[65] *See Fischer v. Fischer*, 1999 WL 1032768, at *3 (Del. Ch. Nov. 4, 1999); *Boyer v. Wilm. Mat'ls, Inc.*, 754 A.2d 881, 902–03 (Del. Ch. 1999); *Odyssey P'rs v. Fleming Co.*, 1998 WL 155543, at *3 (Del. Ch. Mar. 27, 1998). These cases do not aid Plaintiffs here.[66]

---

[64] Pls.' Answering Br. 40.

[65] *Id.* at 39–41.

[66] *Skye Minerals Investors., LLC v. DXS Cap. (U.S.) Ltd.*, 2021 WL 3184591 (Del. Ch. July 28, 2021), and *CMS Investment Holding, LLC v. Castle*, 2015 WL 3894021 (Del. Ch. June

28

Counts II and III of the Amended Complaint are derivative claims under *Tooley*.

**C.** **The Amended Complaint Lacks Particularized Allegations that Demand on the Board Would Have Been Futile.**

Having concluded that Counts II and III assert derivative claims, the court now considers whether those claims must be dismissed under Rule 23.1. Plaintiffs did not make a pre-suit demand on the Board; rather, they allege that demand would have been futile.[67]

### 1. The demand futility standard of review

Section 141(a) of the DGCL provides that a corporation "shall be managed by or under the direction of [its] board of directors." 8 *Del. C.* § 141(a); *McRitchie v. Zuckerberg*, 315 A.3d 518, 536 (Del. Ch. 2024) ("That statutory grant of authority forms the foundation of Delaware's board-centric model of governance."). This

---

23, 2015), do not aid Plaintiffs either. Both cases rely on the concept of a dual-natured claim having both direct and derivative features. *See CMS Inv.*, 2015 WL 3894021, at \*8 (citing *Gentile v. Rossette*, 902 A.2d 91 (Del. 2006), for the proposition that "even in cases involving derivative claims, the same claims can have direct aspects when the allegedly faithless transaction involves an extraction from one group of stockholders, and a redistribution to another, of a portion of the economic value and voting power embodied in the minority interest" (citation modified)); *Skye Mins.*, 2021 WL 3184591, at \*17 (relying on *CMS Inv.* for the same proposition). The Supreme Court rejected the concept of "dual-natured" claims in *Brookfield*. 261 A.3d at 1277 ("[C]orporation overpayment/dilution *Gentile* claims, like those present here, are exclusively derivative under *Tooley* and that *Gentile* . . . should be overruled."); *see Siegel*, 2025 WL 1074604, at \*10 (acknowledging that the *Brookfield* Court "overruled *Gentile* and abrogated 'dual-natured' claims").

[67] Pls.' Answering Br. 43–45.

managerial authority includes whether the corporation should "initiate, or refrain from entering, litigation." *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981); *accord United Food & Com. Workers Union v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. 2021) ("The board's authority to govern corporate affairs extends to decisions about what remedial actions a corporation should take after being harmed, including whether the corporation should file a lawsuit against its directors, its officers, its controller, or an outsider.").

"'In order for a stockholder to divest the directors of their authority to control [a] litigation asset and bring a derivative action on behalf of the corporation,' the stockholder must either make a demand on the company's board of directors or show that demand would be futile." *Ritchie ex rel. Corcept Therapeutics, Inc. v. Baker*, 2025 WL 2048014, at *7 (Del. Ch. July 22, 2025) (quoting *Lenois v. Lawal*, 2017 WL 5289611, at *9 (Del. Ch. Nov. 7, 2017)) (alteration in original). "To plead demand futility, a complaint must allege 'particularized factual statements that are essential to the claim.'" *Ritchie*, 2025 WL 2048017, at *7 (quoting *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000)).

The Board comprised five directors—Adamson, Gandhi, McIntosh, Scotti, and Villamizar. Demand is futile if at least three of the directors on the Board are unable to consider a demand for one of the three reasons outlined in *Zuckerberg*:

    (i)    [T]he director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

(ii) [T]he director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; [or]

(iii) [T]he director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*Zuckerberg*, 262 A.3d at 1059. "To comply with Rule 23.1, the plaintiff must meet 'stringent requirements of factual particularity that differ substantially from . . . permissive notice pleadings.'" *Id.* at 1048 (alteration in original) (quoting *Brehm*, 746 A.2d at 254). "When considering a motion to dismiss a complaint for failing to comply with Rule 23.1, the Court does not weigh the evidence, must accept as true all of the complaint's particularized and well-pleaded allegations, and must draw all reasonable inferences in the plaintiff's favor." *Id.* That being said, however, "[v]ague or conclusory allegations do not suffice to challenge the presumption of a director's capacity to consider demand," and the allegations must satisfy the "stringent requirements of factual particularity." *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007) (citation modified); *Grimes v. Donald*, 673 A.2d 1207, 1214 (Del. 1996) ("Conclusory statements without supporting factual averments will not be accepted as true for purposes of a motion to dismiss."),

*overruled on other grounds by Brehm*, 746 A.2d.[68] "This analysis is fact-intensive and proceeds director-by-director and transaction-by-transaction." *Khanna v. McMinn*, 2006 WL 1388744, at \*14 (Del. Ch. May 9, 2006). It "assesses the ability of the Board in place as of the date of the filing of a complaint." *Schoenmann v. Irvin*, 2022 WL 1792976, at \*12 (Del. Ch. June 2, 2022).

The burden at this stage is on Plaintiffs to overcome a defendant-friendly presumption. "It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm*, 746 A.2d; *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004) ("The key principle upon which this area of our jurisprudence is based is that the directors are entitled to a *presumption* that they were faithful to their

---

[68] In *Brehm*, the Supreme Court overruled seven precedents, including *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested a deferential appellate review. *See Brehm*, 746 A.2d at 253–54 & n.13. The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Id.* at 253–54. The seven partially overruled precedents otherwise remain good law. *See In re Match Gp., Inc. Deriv. Litig.*, 315 A.3d 446, 459 n.85 (Del. 2024) (acknowledging the narrow scope of *Brehm*'s ruling on this point); *id.* at 469 (relying on "*Aronson* and our demand review precedent"); *see also In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 43 n.17 (Del. Ch. 2013).

fiduciary duties."). "In the context of presuit demand, the burden is upon the plaintiff in a derivative action to overcome that presumption." *Beam*, 845 A.2d at 1048–49.

### 2. The demand futility analysis

To establish demand futility, Plaintiffs must allege particularized facts creating a reasonable inference that three of the five Clutter directors could not consider a demand. Plaintiffs argue in broad-brush fashion that demand is futile under each of the three prongs of the *Zuckerberg* test for all five members of the Board.[69] Even assuming that Gandhi and McIntosh could not consider a demand, the Amended Complaint must allege particularized facts that one of either Adamson, Scotti, or Villamizar could not consider a demand. The Amended Complaint fails to do so.

### a. Material benefit

"A director is disabled for demand futility purposes if they received a material personal benefit from the wrongdoing that was not shared equally with the stockholders." *Grabski ex rel. Coinbase Glob., Inc. v. Andreessen*, 2024

---

[69] Pls.' Answering Br. 43–45. The Plaintiffs' brief in opposition to the motion to dismiss devotes only two pages to the specific question of demand futility. *Id.* Rather, the Plaintiffs' brief merely relies on their arguments and allegations that the Amended Complaint states a non-exculpated claim against all of the directors. In doing so, the Plaintiffs elide the critical requirement that they must plead particularized facts to support demand futility, a higher standard than the plaintiff-friendly standard under Rule 12(b)(6). *See Reith v. Lichtenstein*, 2019 WL 2714065, at *6 (Del. Ch. June 28, 2019) "Rule 23.1 places a heightened burden on Plaintiff to plead demand futility by meeting stringent requirements of factual particularity that differ substantially from the permissive notice pleadings of Rules 8 and 12(b)(6)." (citation modified).

WL 390890, at *7 (Del. Ch. Feb. 1, 2024) (citing *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993), and *Zuckerberg*, 262 A.3d at 1058).

Plaintiffs allege that each Director Defendant received a material personal benefit because Iron Mountain gave each director the opportunity to purchase Clutter equity at a discounted rate.[70] This allegation lacks particularity. Plaintiffs point to Iron Mountain's public disclosure that it had sold 15% of its equity interests to "certain former stakeholders" of Clutter in October 2023 and that Eastward and Atomico continued to indicate on their respective websites after the foreclosure that they remained investors in Clutter.[71] From this, Plaintiffs allege it is reasonably inferable that Iron Mountain "made clear" to the Director Defendants that they would be given the opportunity to invest in exchange for their agreement not to stop the foreclosure sale and that the Director Defendants, or their respective affiliates, were the recipients of the investment opportunity.[72]

These conclusory allegations are insufficient to satisfy the particularized pleading requirements of Rule 23.1. The foreclosure sale, through which Iron Mountain foreclosed on the collateral—Clutter's operating subsidiary (Clutter Intermediate, Inc.)—did not, of itself, cancel the Clutter stockholders' equity in

---

[70] Am. Compl. ¶¶ 70–71; Pls.' Answering Br. 20.

[71] Am. Compl. ¶ 59; Pls.' Answering Br. 21–22.

[72] Am. Compl. ¶ 60; *id.* ¶¶ 62, 70–71; Pls.' Answering Br. 22 n.8.

Clutter. There are no well-pleaded allegations that the lingering website representations that Eastward and Atomico were investors in Clutter were inaccurate or reflect anything other than that they, like Plaintiffs, held equity in Clutter. In any event, there are no particularized allegations that Iron Mountain offered each Director Defendant an opportunity to participate in the equity sale, let alone that it was offered before the foreclosure sale. Similarly, there are no well-pleaded allegations as to whom Iron Mountain sold the equity or the amount of equity each participant acquired. In fact, Plaintiffs acknowledge they do not know the identity of the participants in the equity sale.[73] At bottom, Plaintiffs' argument is tethered to a string of inferences that are not supported by particularized allegations and are, therefore, not reasonable.[74] The Amended Complaint is devoid of any particularized allegations that each of the Director Defendants received a material personal benefit by being given an opportunity to participate in the equity sale.[75]

---

[73] *See* Am. Compl. ¶¶ 58, 71. It is worth noting that Atomico, which has since been dismissed from this case by Plaintiffs, submitted an affidavit averring it *did not* purchase any equity from Iron Mountain in the equity sale.

[74] In their briefing, Plaintiffs also rely on a Clutter job listing posted on 8VC's website in November 2024. *See* Pls.' Answering Br. 22 n.8; *id.* Ex. A. This does not remedy Plaintiffs' pleading deficiencies here.

[75] Plaintiffs argue Gandhi separately received a material personal benefit by negotiating future employment with Iron Mountain. *See* Pls.' Answering Br. 18. There are no well-pleaded allegations in the Amended Complaint that Gandhi was engaged in negotiations with Iron Mountain at the time of the challenged transaction, or that Iron Mountain promised Gandhi a future employment opportunity in exchange for his acquiescence to the

Accordingly, Plaintiffs have failed to plead that demand is futile under the first *Zuckerberg* prong.

### b.      Lack of independence

"In the demand futility context, directors are 'presumed to be independent.'" *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 59 (Del. Ch. 2015) (quoting *Beam*, 845 A.2d at 1055). "A lack of independence turns on whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party." *Marchand v. Barnhill*, 212 A.3d 805, 818 (Del. 2019) (citation modified). "When assessing director independence, our courts do not 'anthropologize' directors as simply *homo economicus*; instead, other factors, including personal and business relationships, can influence and, at times, compromise independence. . . . Delaware's independence analysis is context-specific and fact-intensive." *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at \*29 (Del. Ch. Jan. 27, 2021). Director independence may be compromised by a single conflict or a

---

transaction. Even assuming *arguendo* these allegations raise a reasonable doubt as to whether Gandhi can impartially consider a demand, Plaintiffs have failed to plead particularized factual allegations to raise a reasonable doubt as to whether a majority of the Board can impartially consider demand under the first *Zuckerberg* prong. *Zuckerberg*, 262 A.3d at 1059 ("If the answer to any of the [*Zuckerberg*] questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."); *accord Ritchie*, 2025 WL 2048014, at \*8.

36

constellation of lesser connections. *Cal. Pub. Empls.' Ret. Sys. v. Coulter*, 2002 WL 31888343, at \*9 (Del. Ch. Dec. 18, 2002) ("Our cases have determined that personal friendships, without more; outside business relationships, without more; and approving of or acquiescing in the challenged transactions, without more, are each insufficient to raise a reasonable doubt of a director's ability to exercise independent business judgment." (citation modified)).

Plaintiffs do not challenge the independence of Adamson and Villamizar. Plaintiffs do, however, argue that Gandhi, McIntosh, and Scotti lack independence from Iron Mountain.[76] The Plaintiffs' failure to allege particularized facts challenging Scotti's independence leaves them short of satisfying their burden.

Scotti is the founding co-partner of 8VC.[77] 8VC participated in three MakeSpace financing rounds between 2017 and 2020, and Scotti served as a director on MakeSpace's board beginning in 2017.[78] 8VC acquired its Clutter equity through the merger, and Scotti joined the Board as 8VC's designee thereafter.[79]

Plaintiffs allege Scotti lacks independence from Iron Mountain because 8VC and Iron Mountain were long-time co-investors in MakeSpace.[80] Plaintiffs further

---

[76] *See* Pls.' Answering Br. 17–21.

[77] Am. Compl. ¶ 10.

[78] *Id*. ¶ 20.

[79] *Id*. ¶ 10.

[80] *Id*. ¶ 68; Pls.' Answering Br. 19−20.

allege Scotti lacks independence from Iron Mountain because, according to Gandhi, Scotti and McIntosh "always voted as a block," and Scotti, as 8VC's designee, "held an effective proxy to vote for Iron Mountain's director" under Clutter's Certificate.[81]

These allegations do not raise a reasonable doubt that Scotti is "so beholden to [Iron Mountain] that [her] discretion would be sterilized." *Simons v. Brookfield Asset Mgmt. Inc.*, 2022 WL 223464, at *14 (Del. Ch. Jan. 21, 2022). 8VC's participation in MakeSpace financing rounds led by Iron Mountain in 2019 and 2020 does not support a reasonable inference that Scotti felt "subject to [Iron Mountain]'s dominion or beholden to [Iron Mountain] based on those investments." *In re Kraft Heinz Co. Deriv. Litig.*, 2021 WL 6012632, at *9 (Del. Ch. Dec. 15, 2021), *aff'd*, 282 A.2d 1054 (Del. 2022) (TABLE). There are no well-pleaded allegations in the Amended Complaint that 8VC and Iron Mountain coordinated their investment strategy in MakeSpace or that 8VC relied on Iron Mountain to "gain access" to its investment in MakeSpace. *Id.* [82]

---

[81] Am. Compl. ¶ 68; Pls.' Answering Br. 19–20. The certificate provision provides that Iron Mountain's board designee "shall only be entitled . . . to one hundredth (1/100) of a vote on any and all matters to be voted on or approved by the Board of Directors of the Corporation," while the 8VC designee (Scotti) is "entitled . . . to one (1) and ninety-nine hundredths (99/100) votes . . . on any and all matters to be voted on . . . in which exactly six (6) directors vote on." Am. Compl. ¶ 68.

[82] This case is markedly different from those cited by the Plaintiffs in their briefing. *See Tornetta*, 310 A.3d at 508 (concluding post-trial that a director lacked independence from a controller where the director had "extensive business and personal dealings" with the

38

Similarly, Plaintiffs offer no particularized factual allegations to support the assertion that Scotti and McIntosh voted together as a block aside from Gandhi's off-hand comment. This makes this case distinguishable from *Haseotes v. Bentes*, 2002 WL 31058540 (Del. Ch. Sep. 3, 2002). There, this court concluded, for demand futility purposes, that a director lacked independence where the "complaint allege[d] that the Board was equally divided on virtually all issues that came before it" and the director "consistently voted together" with the defendant and "share[d] a common vision for the Company's future." *Id.* at \*6. The court concluded "[t]hose factual allegations create a reason to doubt whether [the director] could consider a proposal to sue an ally." *Id.* The Amended Complaint here contains no such allegations.

As noted above, Plaintiffs' allegations regarding the tie-breaking certificate provision similarly fail to raise a reasonable doubt as to Scotti's independence. As Plaintiffs acknowledge, the certificate provision is only triggered when there are six directors on the Board and there is a tie-breaking vote.[83] There were five directors

controller, "held interests worth over $1 billion" in the controller's other ventures," had "a decades-long relationship" with the controller, and "received millions in [] investments" from the controller); *In re Pattern Energy Gp., Inc. S'holders Litig.*, 2021 WL 1812674, at \*41–42 (Del. Ch. May 6, 2021) (explaining that "long history" between investor and officer defendants, where investor "ha[d] been their co-investor, partner, employer, sponsor, and financial patron" for over a decade, could support the existence of a control group but "declin[ing] to make a definitive determination" on the pleadings-stage record).

[83] Pls.' Answering Br. 20 n.6.

on the Board at all relevant times. Further, there are no well-pleaded allegations in the Amended Complaint that Scotti ever exercised 8VC's voting right. Nor are there any well-pleaded allegations in the Amended Complaint as to the creation of the provision itself. The mere existence of the provision, without more, is not sufficient to overcome the presumption of independence which Scotti enjoys. Accordingly, the court concludes that Plaintiffs have not sufficiently called into question Scotti's ability to consider a demand impartially.[84]

### c. Substantial likelihood of liability

Demand is excused as to any director who "faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand." *Zuckerberg*, 262 A.3d at 1059. "To establish a substantial likelihood of liability at the pleading stage, a plaintiff must make a threshold showing, through the allegation of particularized facts, that their claims have some merit." *In re Camping World Hldgs., Inc. S'holder Deriv. Litig.*, 2022 WL 288152, at *7 (Del. Ch. Jan. 31, 2022) (citation modified), *aff'd*, 285 A.3d 1204 (Del. 2022) (TABLE). Because Clutter's

---

[84] This is so even if the court considers Plaintiffs' argument in their briefing that 8VC and Iron Mountain operated as a control group. *See* Pls. Answering Br. 19–20, 26. 8VC is not a party to these proceedings, and there are no well-pleaded allegations of a control group in the Amended Complaint. *See Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 155 (Del. Ch. 2003) ("Parties may not amend the pleadings through briefing on a motion to dismiss.").

Certificate includes a Section 102(b)(7) exculpatory provision,[85] Plaintiffs must plead with particularity that the Director Defendants face a substantial likelihood of liability on a non-exculpated claim. *Id.*; *Simons*, 2022 WL 223464, at *11. "Whether a director faces a substantial likelihood of liability from a non-exculpated claim turns primarily on . . . whether the complaint pleads particularized facts that support a reasonable inference that the director's decision could be attributed to bad faith." *Id.* (citation modified).

Plaintiffs do not allege specific conduct, on a director-by-director basis, giving rise to an inference of bad faith conduct. Rather, Plaintiffs allege the Director Defendants, collectively, acted in bad faith by acquiescing to the foreclosure sale without considering any alternatives or promoting a competitive auction process for the Company's assets.[86] "Pleading bad faith is a difficult task and requires that a

---

[85] *See* Dkt. 53 ("Iron Mountain Defs.' Opening Br.") at 19 ("Article Nine of the Company's certificate of incorporation includes an exculpatory provision pursuant to 8 *Del. C.* § 102(b)(7) . . . ."); Pls.' Answering Br. 21 n.7 (acknowledging Clutter's exculpatory provision). The court can take judicial notice of the exculpatory provision in Clutter's certificate. *See McMillan v. Intercargo, Corp.*, 768 A.2d 492, 501 n.40 (Del. Ch. 2000) (explaining that this court can take judicial notice of an exculpatory provision in the corporation's certificate of incorporation when considering a pleadings-stage motion).

[86] Am. Compl. ¶¶ 72–73; Pls.' Answering Br. 22–23, 32. Plaintiffs argue in their answering brief that the Director Defendants face liability for breach of the duty of loyalty from having acted with a controlled mindset. *See* Pls.' Answering Br. 28. This argument is without merit. It is neither well pleaded nor mentioned in the Amended Complaint, and lacks factual support. *See In re Trade Desk, Inc. Deriv. Litig.*, 2025 WL 503015, at *24 (Del. Ch. Feb. 14, 2025) ("[A] stockholder plaintiff cannot merely slap a 'controlled

---

director acted inconsistent with his fiduciary duties and, most importantly, that the director *knew* he was so acting." *McElrath v. Kalanick*, 224 A.3d 982, 991–92 (Del. 2020) (citation modified); *Ironworkers Dist. Council of Phila. & Vicinity Ret. & Pension Plan v. Andreotti*, 2015 WL 2270673, at *27 (Del. Ch. May 8, 2015) ("Demonstrating that directors have breached their duty of loyalty by acting in bad faith goes far beyond showing a questionable or debatable decision on their part."), *aff'd*, 132 A.3d 748 (Del. 2016) (TABLE).

"To establish demand futility through allegations of bad faith, a plaintiff must plead particularized facts that can support a reasonable inference about the directors' state of mind." *City of Hialeah Empls.' Ret. Sys. ex rel. nCino, Inc. v. Insight Venture P'rs, LLC*, 2023 WL 8948218, at *6 (Del. Ch. Dec. 28, 2023) (citation modified), *aff'd sub nom. City of Hialeah Empls.' Ret. Sys. v. Insight Venture P'rs, LLC*, 326 A.3d 1201 (Del. 2024) (TABLE); *see Trade Desk*, 2025 WL 503015, at *22 (observing that plaintiffs must plead facts giving rise to a reasonable inference that the director defendants acted with scienter). "At the pleading stage, the test is

---

mindset' label onto a process or result with which it disagrees and expect to wrest control of a claim from a majority independent and disinterested board of directors. Plaintiffs must still satisfy their obligations under Rule 23.1 to plead particularized facts supporting an inference of bad faith conduct amounting to a breach of the duty of loyalty."), *appeal docketed*, Case No. 114, 2025 (Del. Mar. 14, 2025); *Eckert v. Hightower*, 2025 WL 930788, at *5–7 (Del. Ch. Mar. 24, 2025) (relying on *Trade Desk* and granting motion to dismiss under Rule 23.1 for failure to plead particularized facts supporting an inference that the defendants acted in bad faith).

42

whether the complaint alleges a constellation of particularized facts which, when viewed holistically, support a reasonably conceivable inference that an improper purpose sufficiently infected a director's decision to such a degree that the director could be found to have acted in bad faith." *IBEW Loc. Union 481 Defined Contribution Plan & Tr. ex rel. GoDaddy, Inc. v. Winborne*, 301 A.3d 596, 623 (Del. Ch. 2023).

Plaintiffs, relying on *Winborne*, argue that the "extreme disparity" between the Company's valuation and the price paid by Iron Mountain for the Company's assets alone supports an inference of bad faith.[87] According to Plaintiffs, "the fact that Iron Mountain acquired a company worth over $1 billion for no more than $60 million speaks for itself."[88] In *Winborne*, this court concluded, at the pleadings stage, that the defendants faced a substantial likelihood of liability for acting in bad faith. The court considered a "constellation of factors," including the "stark contrast" between a $175 million liability on the company's financial statements and the $850 million payment approved by the board to settle that liability. *Id.* at 626. The court observed "[t]he contrast between those figures is so glaring as to support a claim of waste and hence an inference of bad faith on that basis alone." *Id.*

---

[87] Pls.' Answering Br. 32 (quoting *Winborne*, 301 A.3d at 626).

[88] *Id*. at 22.

That is not the case here. The Amended Complaint lacks particularized allegations to give rise to a reasonable inference that Clutter was worth over $1 billion at the time of the foreclosure sale. Plaintiffs allege Clutter was worth $1.2 billion "as recently as mid-2022," shortly after the merger closed.[89] Clutter faced short term liquidity issues in early 2023.[90] The Amended Complaint lacks particularized allegations to support a reasonable inference that the basis for the supposed $1.2 billion valuation in mid-2022 was valid a year later.[91] Moreover, the cause of the alleged valuation disparity in this case is different and not as stark as what the court observed in *Winborne*.[92] This alleged valuation disparity across a one-year period, absent more, does not support a pleadings-stage inference of bad faith.

---

[89] Am. Compl. ¶ 2. The allegation is based on a series of inferences Plaintiffs draw from comments and events strung together over a three-year period:

> In May 2022, Clutter's counsel . . . informed Plaintiffs that the value of their investment had "gone up" since 2019. Clutter had been valued at $600 million in 2019. Given that the exchange ratio [in the merger] resulted in Iron Mountain's equity share giving from about 50% of MakeSpace to about 25% of the combined entity, the transaction clearly valued the two component companies equally. As a result, before the incorporation of synergies, the combined entity was worth about $1.2 billion.

*Id.* ¶ 31.

[90] Am. Compl. ¶ 34.

[91] Eastward's notice of default indicates that "[Eastward] has determined that [Clutter] is unable to pay its debts (including trade debts) as they become due and has otherwise failed to be solvent as described under Section 5.5 of the Loan Agreement." Director Defs.' Opening Br. Ex. 1 at 2 (quoting Section 8.5 of the Loan Agreement).

[92] Plaintiffs have not asserted a claim for waste.

44

Plaintiffs also argue the Director Defendants knew they were not acting in the Company's best interest "by acquiescing" to the foreclosure sale.[93] Plaintiffs do not challenge the Company's decision to enter into the loan agreement with Eastward. Rather, Plaintiffs contend the Board did nothing to stop the foreclosure sale and knowingly allowed Eastward and Iron Mountain to walk away with the Company's assets at a haircut. This is not a reasonable inference. The Company defaulted on its $20 million secured debt. The Amended Complaint does not allege that Clutter was not in default. Eastward had a contractual right to foreclose on the Company's assets and was taking immediate steps to do so. The Amended Complaint acknowledges that the Board considered alternative proposals, such as filing for bankruptcy or seeking interim injunctive relief, but opted not to pursue either proposal.[94] Plaintiffs take issue with the fact that the Board did not hire an investment bank to advise the Company on alternatives to the foreclosure or to solicit other potential buyers.[95] But that alone is insufficient to support an allegation of bad faith. *See Zimmerman v. Crothall*, 2012 WL 707238, at *9 (Del. Ch. Mar. 5, 2012) ("The Board was under no obligation to hire financial advisors, and the Company's limited cash position likely would have made it reluctant to incur such an expense.").

---

[93] Pls.' Answering Br. 22–23.

[94] Am. Compl. ¶¶ 49−50.

[95] *Id.* at ¶ 51.

The context is important. Eastward sent its notice of default on June 14, 2023. A week later, Eastward informed Clutter of its intent to foreclose within 10 days. The Board was operating on a highly accelerated timeline set by Eastward. It was suboptimal. The Board's process may have had its flaws, but "a failure to follow best practices is not necessarily a breach of fiduciary duty." *McElrath ex rel. Uber Techs., Inc. v. Kalanick*, 2019 WL 1430210, at *16 (Del. Ch. Apr. 1, 2019), *aff'd sub nom. McElrath v. Kalanick*, 224 A. 3d 982 (Del. 2020). "Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty." *In re McDonald's Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 685 (Del. Ch. 2023). Simply "[m]ixing together odds and ends of minor critiques is not a recipe for bad faith, even with a hearty serving of plaintiff-friendly inferences." *Cent. Laborers' Pension Fund v. Karp*, 2025 WL 1213104, at *19 (Del. Ch. Apr. 25, 2025) (citation modified). Plaintiffs' allegations fall short of the mark here.

The Plaintiffs have failed to plead particularized factual allegations to give rise to a reasonable inference that a majority of the Director Defendants face a substantial likelihood of liability from this litigation. Accordingly, Counts II and III are dismissed for failure to plead demand futility under Rule 23.1.[96]

---

[96] Because the court finds the demand is not excused and dismissal of Counts II and III is appropriate, the court does not reach the Defendants' remaining arguments under Rule 12(b)(6).

**D.     The Plaintiffs have not stated a statutory claim under Section 271.**

Finally, the court considers whether Count I states a claim under Section 271 of the DGCL. Plaintiffs allege the "transfer of assets to Eastward constituted a sale of all or substantially all of Clutter's assets," requiring a stockholder vote under Section 271(a).[97] Because there was no stockholder vote, Plaintiffs allege that the transaction is void.[98] The Director Defendants argue that a stockholder vote under Section 271 was not required to facilitate the foreclosure sale. The Director Defendants offer two arguments: (1) Section 271 approval was not required under the statutory regime as it existed at the time of the foreclosure sale and (2) even if a vote were required under the statutory framework that was in effect at the time of the foreclosure sale, a subsequent amendment to Section 272 makes clear that no such vote is required.[99] The court agrees with the first argument and does not reach

---

[97] Am. Compl. ¶ 78.

[98] *Id.* ¶ 79; *see* Pl.'s Answering Br. 46−49.

[99] In 2023, the General Assembly amended Section 272 of the DGCL. The amendment added Section 272(b), which provides, in pertinent part:

> (b) Without limiting the rights of a secured party under applicable law, no resolution by stockholders shall be required by § 271(a) of this title for a sale, lease or exchange of property or assets if such property or assets are collateral that secures a mortgage or are pledged to a secured party and either:

> (1) The secured party exercises its rights under the law governing such mortgage or pledge or other applicable law, whether under Article 9 of a

the second.  A corporation's disposition of all or substantially all assets implicates

Section 271 of the DGCL.  Section 271(a) of the DGCL provides, in pertinent part:

> Every corporation may at any meeting of its board of directors or governing body sell, lease or exchange all or substantially all of its property and assets, including its goodwill and its corporate franchises, upon such terms and conditions and for such consideration, which may consist in whole or in part of money or other property, including shares of stock in, and/or other securities of, any other corporation or corporations, as its board of directors or governing body deems expedient and for the best interests of the corporation, when and as authorized by a resolution adopted by the holders of a majority of the outstanding stock of the corporation entitled to vote thereon . . . at a meeting duly called upon at least 20 days' notice. The notice of the meeting shall state that such a resolution will be considered.

8 *Del. C.* § 271(a).

The Director Defendants argue that "Section 271(a) does not apply to

foreclosure sales."[100]  The Director Defendants rely on Section 272 of the DGCL as

it existed at the time of the foreclosure sale and Chief Justice Strine's transcript

ruling in *Gunnerman v. Talisman Cap. Talon Fund, Ltd.*, C.A. No. 1894-VCS (Del.

Ch. July 12, 2006) (TRANSCRIPT), while serving as a Vice Chancellor on this

court.[101]  In *Gunnerman*, a stockholder plaintiff brought a derivative suit against a

---

> Uniform Commercial Code, a real property law or other law, to effect such sale, lease or exchange without the consent of the corporation. . . .

8 *Del. C.* § 272(b).

[100] Director Defs.' Opening Br. 27.

[101] *Id.* 28−29.

corporation's current and former directors, officers, and controlling stockholders, alleging that the defendants breached their fiduciary duties by allowing the company's secured creditor to foreclose on all of its assets and by failing to seek other alternatives that would have been more financially favorable to the company. In addition to the derivative claims, the stockholder plaintiff asserted a direct claim under Section 271, alleging the foreclosure constituted a sale or an exchange of the company's assets under the statute and required a vote of the company's stockholders. At the pleadings stage, then-Vice Chancellor Strine dismissed the claims. In dismissing the Section 271 claim, he referenced Section 272, which at the time stated: "The authorization or consent of stockholders to the mortgage or pledge of a corporation's property and assets shall not be necessary, except to the extent that the certificate of incorporation otherwise provides." Discussing the interplay between Sections 271 and 272, the Chief Justice concluded:

> I am going to dismiss the case. . . . I think the only claim that would possibly be a direct claim fails to state a claim, which is the 271 claim. . . . [T]he Delaware General Corporation Law clearly makes a distinction between financing transactions, mortgage transactions, collateral transactions, and sales of assets. And I don't think you can have a situation where there's the original financing transaction that pledges the collateral is outside 271's reach and then say when the creditor exercises rights under that that are within the four corners or arguably a lesser -- lesser-included option, that that somehow then triggers a stockholder vote. I think that would be bad for -- frankly, for equity investors in general, because I think it would raise the cost of capital, because it would -- it would create sort of a highjack situation that you sometimes see in new bankruptcies where it appears that everybody has to get something simply because they're present.

49

*Gunnerman*, C.A. No. 1894-VCS, at 33:2–34:7.

Plaintiffs argue that the Delaware Supreme Court "rejected" the *Gunnerman* by holding in *Stream TV Networks, Inc. v. SeeCubic*, 279 A.3d 323 (Del. 2022) ("*Stream TV II*").[102] Plaintiffs argue the Supreme Court in *Stream TV II* "explicitly held § 271 'contains no exceptions and is not ambiguous.'"[103] Plaintiffs also argue that the Supreme Court, in discussing *Gunnerman*, "described a narrow exception for 'foreclosure proceedings in Superior Court' because 'judicial foreclosure proceedings [do not] implicate Section 271.'"[104]

In *Stream TV II*, the Supreme Court addressed whether approval of a corporation's Class B common stockholders was required to effectuate an agreement to transfer the company's pledged assets to a newly created holding company controlled by its secured creditors (the "Omnibus Agreement"). 279 A.3d at 328. The Omnibus Agreement provided that the debtor company's secured creditors would accept delivery of the company's assets in satisfaction of the creditors' debts in lieu of continuing to pursue a foreclosure action that they had earlier filed in the Superior Court. *Id.* Pursuant to the Omnibus Agreement, the debtor company

---

[102] Pls.' Answering Br. 46.

[103] *Id.* (quoting *Stream TV*, 279 A.3d at 353).

[104] Pls.' Answering Br. 47 (alteration in original) (quoting *Stream TV II*, 279 A.3d at 355, n.180).

50

agreed to transfer its assets to the newly formed entity (SeeCubic, Inc.), and secured creditors agreed to extinguish all of their secured debt following the transfer. *Id.* In addition, the Omnibus Agreement gave holders of some of the Company's Class A common stock the right to exchange their shares for an identical number of shares in SeeCubic and provided for the debtor company to receive common stock in SeeCubic. *Id.*

At the trial court level, this court, at the preliminary injunction stage, held that a stockholder vote was not required under Section 271 to effectuate the Omnibus Agreement. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1033 (Del. Ch. 2020) ("*Stream TV I*"), *rev'd*, 279 A.3d 323 (Del. 2022). This court concluded "the language of Section 271 is ambiguous as to whether it applies to transactions like the Omnibus Agreement," and engaged in a detailed history of the common law governing asset sales along with the historical development of the statutory regime. *Id.* at 1041. The court concluded that the development of the statute and the common law that preceded it "demonstrate[s] that Section 271 does not apply to a transaction like the one contemplated by the Omnibus Agreement, in which an insolvent and

failing firm transfers its assets to its secured creditors in lieu of a formal foreclosure proceeding." *Id.*[105]

In addition to finding that enactment of the statutory regime did not eliminate the insolvency exception at common law, this court drew further support from *Gunnerman*, which was the only case cited by the parties "involving a claim that Section 271 applied to a transfer of assets to a secured creditor." *Stream TV I*, 250 A.3d at 1043. The court amplified the public policy concerns that would result from requiring compliance with Section 271 whenever a creditor sought to foreclose on its security:

> As *Gunnerman* suggests, a regime of this sort would have detrimental effects for everyone. Creditors would suffer the first-order effects when they tried to foreclose on collateral. Corporations and stockholders would suffer the second-order effects as creditors adjusted to the new reality, insisted on additional protections, and raised the cost of capital. Section 271 should not be interpreted to produce such a mischievous and harmful result.

*Id.*

The court also held that a stockholder vote was not required under the company's certificate of incorporation, which required approval by the Class B stockholder in order to consummate an "Asset Transfer." *Id.* at 1043. The certificate

---

[105] The court also stated: "Because Section 271 does not cover the worst case transaction for [the company]—a foreclosure involving all of its assets—it logically does not apply to a lesser included alternative that provides greater benefits to [the company] and its stockholders." *Stream TV I*, 250 A.3d at 1043.

defined "Asset Transfer" as "a sale, lease or other disposition of all or substantially all of the assets or intellectual property of [the company] or the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of [the company]." *Id.* at 1044–45. The court concluded the language of the company's certificate "tracks the text of Section 271 and warrants the same interpretation." *Id.* at 1045.

The Supreme Court in *Stream TV II* disagreed, drawing a distinction between the statute and the language in the certificate. The Court held that "the Omnibus Agreement effects an 'Asset Transfer' that unambiguously triggers a majority vote of the Class B stockholders" under the company's certificate. *Stream TV II*, 279 A.3d at 337. The Court held the language of Section 271 was "materially different" from the certificate and declined to consider Section 271 as an interpretative guide in construing the certificate. *Id.* Because the Court concluded that a stockholder vote was required under the certificate, the Court did "not resolve whether such a vote is also required under the plain language of Section 271, *i.e.,* whether the Omnibus Agreement effects a 'sale, lease or exchange' within the meaning of Section 271." *Id.*

The Court went on to write that "although [it] need not further consider Section 271,[it] clarif[ied] that a common law insolvency exception, if one existed in Delaware, did not survive the enactment of Section 271 and its predecessor." *Id.*;

*see also id.* at 355 ("Accordingly, we clarify that there presently is no insolvency exception embedded in Section 271.").

Although the Supreme Court declined to embrace a common law insolvency exception to Section 271, I do not read the Court's decision in *Stream TV II* to reject the holding in *Gunnerman*. The Supreme Court cites the *Gunnerman* transcript ruling once in a footnote at the end of its decision. That footnote reads in its entirety:

> As we noted earlier, the Court of Chancery identified a single public policy concern, namely, "interpreting Section 271 as applying to a creditor's efforts to levy on its security would undercut the value of the security interest." *Stream TV*, 250 A.3d at 1042. The court cited to then Vice-Chancellor Strine's transcript ruling in *Gunnerman v. Talisman Capital Talon Fund, Ltd.* where he observed that the DGCL distinguishes between financing transactions, mortgage transaction[s], collateral transactions, and sales of assets. *Id.* at 1043 (citing *Gunnerman v. Talisman Cap. Talon Fund, Ltd.*, C.A. No. 1894-VCS (Del. Ch. July 12, 2006) (TRANSCRIPT)). Following this reasoning, the court, in its P.I. Opinion [*i.e.*, *Stream TV I*], reasoned that interpreting Section 271 to require a stockholder vote before an insolvent or failing corporation can transfer its assets to secured creditors would conflict with Section 272 of the DGCL. *Id.* at 1021. We note that Section 271 presents no barrier to the parties' foreclosure proceedings in Superior Court (which are presently stayed pending this appeal), and no party has argued that judicial foreclosure proceedings implicate Section 271. Moreover, Section 272 is a default rule that corporations can alter in their charters, which Stream has done here.

279 A.3d at 355 n.180.

The court does not interpret the Supreme Court's discussion in *Stream TV II* to reject the holding or reasoning in *Gunnerman*. The Supreme Court cited *Gunnerman* in its explanation of the public policy concern raised by this court in its

54

statutory analysis in its preliminary injunction decision in *Stream TV I*. As explained above, the Supreme Court did not opine on whether a stockholder vote was required under Section 271 to effectuate the Omnibus Agreement. The Supreme Court relied on the certificate as the basis for its decision. Notwithstanding, the Supreme Court explains in *dicta* that Section 271 presents "no barrier" to judicial foreclosure proceedings initiated by the company's secured creditor, which were stayed pending the outcome of the appeal, and none of the parties raised that issue on appeal. The Supreme Court did not otherwise address the substance of the *Gunnerman* decision or opine on the merits. In the court's view, the Supreme Court's *Stream TV II* opinion did not reject *Gunnerman* or its reasoning, which remains as persuasive authority.[106]

In considering *Stream TV II* and *Gunnerman*, the court concludes that it is not reasonably conceivable that a stockholder vote was required under Section 271 to effectuate the foreclosure sale in this case. The Supreme Court did not state that a judicial foreclosure proceeding was the only avenue available to a secured creditor seeking to exercise its contractual right to foreclose on the collateral without triggering Section 271. The facts of this case are far removed from the Omnibus Agreement that was at issue in *Stream TV II*. The Amended Complaint alleges

---

[106] *Day v. Diligence, Inc.*, 2020 WL 2214377, at *1 (Del. Ch. May 7, 2020) ("Transcript Rulings generally have *no* precedential value in this Court . . . at most they offer persuasive authority.").

Eastward served the Company with a notice of default, foreclosed on the Company's assets, and sold them at a public auction where they were purchased by Iron Mountain. Unlike in *Stream TV II*, the Amended Complaint contains no allegations that the Company entered into a contractual arrangement with Eastward and Iron Mountain to transfer the Company's assets in lieu of a foreclosure. Indeed, there are no allegations that the Company took action to facilitate the foreclosure sale. Consistent with *Gunnerman*, the court concludes that the foreclosure sale in this case did not trigger a stockholder vote under Section 271.[107]

Accordingly, Count I of the Amended Complaint is dismissed for failure to state a claim under Rule 12(b)(6).

## III. CONCLUSION

For the foregoing reasons, Count I is dismissed under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Counts II and III are dismissed under Rule 23.1 for failure to plead demand futility. Count II is also dismissed as to Iron Mountain under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Accordingly, the Amended Complaint is dismissed in its entirety.

---

[107] Because the foreclosure sale did not require approval under DGCL Section 271, the court need not reach the Individual Defendant's alternative argument that the 2023 amendment to Section 272 exempted the foreclosure sale from Section 271.